IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LINDA S. JACOBY,

Plaintiff,

vs.

FOOD BANK FOR THE HEARTLAND,

Defendant.

**8:25CV650**

**MEMORANDUM AND ORDER**

Plaintiff Linda S. Jacoby ("Plaintiff"), a non-prisoner proceeding in forma pauperis, *see* Filing No. 6, filed a Complaint on November 7, 2025 (the "Complaint"), Filing No. 1. The Court is required to review in forma pauperis complaints to determine whether summary dismissal is appropriate. *See* 28 U.S.C. § 1915(e).

For the reasons that follow, this Court finds that, as pleaded, Plaintiff's Complaint must be dismissed. However, in lieu of dismissal this Court shall sua sponte grant Plaintiff leave to amend her Complaint in accordance with this Memorandum and Order.

## I. SUMMARY OF COMPLAINT

Plaintiff alleges disability discrimination in violation of the Americans with Disabilities Act[1] (the "ADA") and the Family and Medical Leave Act (the "FMLA") arising from her employment with Defendant Food Bank for the Heartland between January 13, 2025, and her termination on October 23, 2025. Filing No. 1 at 3-4. In support of her claims Plaintiff states:

> While the central violations began on or about 01/13/25 and continued through my termination on 10/23/25, it is important to note that I had previously submitted a physician's ADA accommodation letter in 2021 for the same disabilities. In 2021, my employer honored those

[1] 42 U.S.C. §12101 *et seq*.

> accommodations under prior leadership. However, when I renewed my request on 01/13/25 and referenced the prior documentation, the organization failed to engage in the interactive process or provide updated ADA paperwork. Instead, I was steered toward FMLA leave despite having clearly communicated that I did not require extended time off, but rather workplace accommodations. This manipulation ultimately left me unprotected when my medical conditions worsened and led to my termination.

*Id.* at 5.

Plaintiff also attaches her "Charge of Discrimination" filed with the Nebraska Equal Opportunity Commission (the "EEOC Charge"). *Id.* at 8-14. In the EEOC Charge, she elaborated on her claims as follows:

> 1. Failure to Accommodate
>
> In January 2025, I disclosed my disabilities and formally requested ADA accommodations. Rather than engaging in the required interactive process, leadership rerouted me to FMLA leave, despite my objections, and made no effort to explore alternative options or modified duties. I was not provided with ADA paperwork, and my outreach was either ignored or redirected inappropriately, an unmistakable violation of the ADA's interactive process requirement.
>
> In April 2025, following medical leave, I submitted a second accommodation request to resume evening work twice weekly to complete time-sensitive deliverables. This request was consistent with my long-established schedule and would not have interfered with my recovery. My request was ignored for days. When I followed up, I was met with vague objections and an outright denial, again without meaningful engagement. These repeated failures reflect bad-faith avoidance of legally mandated processes.
>
> 2. Retaliation after Disclosure
>
> Immediately after disclosing my disabilities and reporting a hostile work environment to HR in January 2025, I experienced abrupt and severe changes to my role. I was excluded from key meetings I had previously led or co-facilitated, cut off from system access, excluded from the creation of numerous new reporting structures that were essential to my role, and removed from long-standing cross-departmental work. My responsibilities were stripped and redistributed without explanation despite my being the only person with historical knowledge of those workflows. I was left with

vague, diminishing tasks inconsistent with my experience or job title. This abrupt shift in treatment directly followed my protected disclosures.

3. Hostile Work Environment

The appointment of Calib Miller as Vice President in October 2024 ushered in a toxic and exclusionary workplace culture. Calib's behavior included aggression, gaslighting, micromanagement, performative support, and public undermining. He created a climate of fear and instability that escalated further after my disclosures.

I reported his conduct to HR in January 2025, describing the escalating hostility, retaliation, and emotionally unsafe environment. Despite multiple internal complaints from me and other staff, no corrective action was taken. My distress grew so severe that by March 2025, I required medical leave. The harm I experienced was directly tied to the organization's failure to address the hostile environment I reported in good faith.

4. Discriminatory Surveillance and Unequal Scrutiny

After attempting to return to work following medical procedures in April 2025, I was placed under a new supervisor, Tresha Rodgers. Instead of supporting my return, Tresha subjected me to invasive and excessive oversight, including frequent questioning about my schedule, broad email surveillance, forced and unnecessary meetings related to common data requests, and demands to document every request and output. These expectations were not applied to my peers and contradicted Tresha's own stated management style and organizational norms. Her behavior, layered atop the already hostile environment, further suggested that my disability status and prior protected activity were being used to justify unequal scrutiny.

5. HR Breakdown and Confirmed Conflict of Interest

Amber Durr, Vice President of HR, failed to take action on multiple internal complaints about Calib Miller, including mine. While concerns about their personal relationship circulated internally for months, the organization formally confirmed their romantic partnership in its June 2025 newsletter, congratulating them on purchasing a home together. This public acknowledgment of a serious conflict of interest casts doubt on the objectivity and neutrality of HR's handling of complaints involving Calib. It also helps explain Amber's pattern of obstruction and inaction.

As employees continued to report abuse, exclusion, and toxic leadership, HR failed to investigate, initiate accountability measures, or protect staff

from retaliation. Multiple colleagues were pushed out or resigned while those responsible faced no consequences.

6. Misuse of Leave and Strategic Retaliation

On April 2, 2025, while I was on medically certified leave, I received a threatening email from HR demanding completion of new training modules (following another employee's official complaint of gender discrimination and hostile work environment) or face discipline. These demands ignored my leave status and added unnecessary pressure during a time of active recovery, especially when I still had a week left to complete these trainings.

In addition, during this same period, Calib Miller attempted to coerce me into completing an extensive, high-stakes data report for the Board of Directors, known internally as the quarterly operations metrics, with just two days' notice. This report is highly complex, requiring significant data gathering, analysis, and coordination across departments. I had completed this report several times in the past with the guidance of now-departed executives, and Calib was fully aware of my role, having been copied on related communications since his start in October 2024.

Despite being excluded from all operations reporting work for months (which had been acknowledged by several Directors who expressed frustration and confusion and led to one Director raising concerns with HR), I was abruptly called into an impromptu eight-minute meeting with Calib and Executive Assistant, Donna, on April 21, 2025. Calib arrived late, offered no acknowledgment of my prior experience, and declared that although I reported to Tresha Rodgers, "most of your work will be for me." He made this demand knowing I was still dealing with ongoing medical issues and simultaneous quarterly reporting obligations. Donna later acknowledged that she had withheld the usual advance notice, something I had always received, because Calib insisted on reviewing the task first to be "comfortable" with it. His last-minute scramble only occurred after he realized no one else at the organization knew how to complete the report.

This was a clear setup: I was excluded for months, then suddenly pressured to deliver a massive product under impossible conditions, while still recovering and on intermittent leave. The experience caused further emotional and medical distress and prompted me to escalate my concerns to HR once again. Unfortunately, HR failed to take meaningful action, and in my first 1:1 with Tresha that followed, she sidestepped the issue and deferred all discussion of ADA concerns back to HR, further reinforcing the pattern of avoidance and retaliation.

Later in May, HR once again delayed and obstructed my access to short-term disability paperwork, insurance guidance, and FMLA status updates. I

> sent a formal, time-stamped letter on May 30, 2025, to HR and the CEO documenting this continued legal noncompliance. In that email, I outlined the willful failure to respond to time-sensitive ADA requests, the sabotaging of my ability to access care, and HR's refusal to engage in the required interactive process. I included clear demands and a deadline for resolution. They failed to respond in time. This willful neglect created emotional harm, legal jeopardy, and financial insecurity and shows clear retaliatory motive.
>
> Additional Context
>
> Since Calib Miller's hiring in October 2024, over 20 staff, including senior leadership, have either resigned or been forced out. Many cited the toxic environment and lack of accountability as reasons. These departures have been coupled with worsening morale and widespread fear among staff.
>
> Two anonymous yet detailed employee reviews posted publicly on Indeed describe identical experiences of retaliation, ADA violations, and HR misconduct. These reviews mention being forced out after requesting accommodations, gaslighting by leadership, and being sabotaged by the HR department. Their timing, tone, and specificity strongly suggest internal origin and corroborate my experience. Taken together, they reflect a pattern of systemic abuse, not an isolated incident.

*Id.* at 9-10.

Plaintiff seeks compensatory damages, declaratory, and injunctive relief. *Id.* at 12.

## II. APPLICABLE LEGAL STANDARDS ON INITIAL REVIEW

The Court is required to review in forma pauperis complaints to determine whether summary dismissal is appropriate. *See* 28 U.S.C. § 1915(e). The Court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

Pro se plaintiffs must set forth enough factual allegations to "nudge[] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569–70 (2007); *see also* *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.”).

“The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party ‘fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.’” *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). However, “[a] pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties.” *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. ADA Claims

Liberally construed, Plaintiff asserts the following five claims for relief under the ADA in her Complaint: (1) employment discrimination, (2) retaliation, (3) failure to accommodate, (4) unequal terms and conditions of employment, and (5) hostile work environment. Filing No. 1 at 4. As set forth in the ADA:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Title V of the ADA makes it “unlawful for an employer to discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]....” 42 U.S.C. § 12203(a).

#### 1. Employment Discrimination and Failure to Accommodate

“To establish discrimination under the ADA, an employee must show that she (1) is

disabled within the meaning of the ADA,[2] (2) is a qualified individual under the ADA,[3] and (3) has suffered an adverse employment action because of her disability." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (citing *Huber v. Wal–Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007)). To establish a failure to accommodate under the ADA an employee must establish all the elements of ADA employment discrimination plus plead the following failure to accommodate elements: (1) their employer was aware of the disability; (2) and the employer failed to reasonably accommodate the disability. *See Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 762 (N.D. Ill. 2020); *see also Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015) (holding that to state a failure-to-accommodate claim, a plaintiff first "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it.").

The pleading standard for stating an ADA discrimination claim is somewhat relaxed as a plaintiff need not plead facts sufficient to establish a prima facie case of employment discrimination in his or her complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002), *abrogated in part on other grounds by Twombly*, 550 U.S. at 570. Instead, a complaint must contain sufficient facts to state a claim for relief that is plausible on its face, However, the elements of a prima facie case are still relevant to a plausibility determination, and while it appears Plaintiff may be able to meet the standard, Plaintiff's Complaint requires amendment to proceed on both her employment discrimination and

[2] The ADA defines disability as: (i) a physical or mental impairment that substantially limits one or more of an individual's major life activities; (ii) a record of such an impairment; or (iii) being perceived or regarded as having such an impairment. 42 U.S.C. § 12102(2).

[3] A qualified individual must "(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (internal quotation omitted); *see also* 42 U.S.C. § 12111(8).

failure to accommodate claims. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013) (stating elements of a prima facie case are "part of the background against which a plausibility determination should be made" and "may be used as a prism to shed light upon the plausibility of the claim"); *see also Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) ("While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her Complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim.").

Plaintiff describes her disabilities as "pyloric stenosis, GI disease, orthopedic, mental health" and that she received accommodations previously from her employer for these disabilities. *See* Filing No. 1 at 4, 9-10. Under a very liberal construction allowed at this stage of the proceedings, Plaintiff has alleged sufficient facts to establish that she was disabled within the meaning of the ADA, and that she suffered an adverse employment action. However, while Plaintiff connects her disability to her termination via concluding she was terminated due to making multiple requests for workplace accommodation (which she contends were denied), *see id.* at 5, 9, the sparce facts alleged in her Complaint do not actually suggest that her termination was because of her disability and instead relate to her inability to complete assigned work. Because Plaintiff does not describe what accommodation she sought and how her requested accommodation connects to her disabilities directly, much less how her disabilities affected her work assignments (or whether if given the accommodations she would have been able to complete the assigned tasks), the Court cannot ascertain what Plaintiff required as opposed to what Plaintiff received.[4] Moreover, the Court is unable to

[4] While it appears from the allegations in the Complaint that Plaintiff required specific working hours it is not entirely clear what specific accommodations Plaintiff required. As such it is suggested that Plaintiff list or

ascertain whether Plaintiff is a "qualified individual" because the specific nature of Plaintiff's original job duties are not specified in her Complaint.

To be clear, Plaintiff alleges that she had previously requested workplace accommodation related to her disabilities from the same employer and received it. Then Plaintiff alleges that she requested workplace accommodation in 2025, but it was denied, and her employer instead suggested she pursue taking leave. Then, after she had requested accommodation, her job duties were changed to the extent she was unable to complete the assigned tasks. While these allegations do potentially support her claims, the Court is unable to determine from the pleadings if Plaintiff was unable to complete her new assignment(s) because she did not receive appropriate disability accommodation or if she was unable to complete the new assignments regardless of her disabilities due to time constraints and/or lack of skills/training to complete them. *See Id.* (alleging that changes were made to her job rendering her position one of "diminishing tasks inconsistent with [her] experience or job title" resulting in her being "expected to deliver a massive product under impossible conditions"). This distinction is necessary to address her disability discrimination, her failure to accommodate claim, and her retaliation claim as discussed in the following section.

**2. Retaliation**

To establish unlawful retaliation under the ADA an employee must show that: (1) she engaged in statutorily protected activity; (2) the employer took an adverse action against her; and (3) there was a causal connection between the adverse action and the

otherwise specifically state what accommodations she requested and why she needed them as they relate to her disabilities in any amended complaint she files.

protected activity. *See, e.g., Walker*, 737 F.3d at 1218. A protected activity is "an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question." *Jeseritz v. Potter*, 282 F.3d 542, 548 (8th Cir. 2002) (quoting *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000)); *see Van Orden v. Wells Fargo Home Mortgage, Inc.*, 443 F.Supp.2d 1051, 1060-61 (S.D.Iowa 2006) (opposition "under Eighth Circuit law includes filing a charge of discrimination, making internal complaints or informal complaints to superiors, or expressing a belief that [an] employer has engaged in discriminatory practices").

Here, Plaintiff alleges that she previously disclosed her disabilities to her employer via formally requesting ADA accommodations in 2021, which she received, but upon resubmitting a letter in January of 2025 requesting accommodations for the same disabilities, she was "steered toward FMLA leave" instead, despite what she describes as "outreach" and "objections" to her employer's failure to provide ADA paperwork. *See* Filing No. 1 at 5. However, Plaintiff must also connect the adverse actions taken by her employer and the protected activity - the complaints regarding her employer's failure to provide her with ADA paperwork and accommodation.

Plaintiff appears to allege that after she sought disability accommodation, she was given new tasks which were outside the scope of her job duties which were not possible for her to complete regardless of her disabilities, insinuating that the changes to her position were made because of her disability accommodation request. While such actions would support a retaliation claim, Plaintiff cannot simply conclude that the changes in her job were made as a result of her disability/accommodation requests and instead should

provide specific facts supporting her conclusion.

**3. Unequal terms and conditions of employment**

> To establish a prima facie case of discrimination based upon unequal terms and conditions of employment, Plaintiff must show that: (a) the employer is subject to the ADA; (b) she suffers from a disability within the meaning of the ADA; (c) there was an inference of discrimination; and (d) she suffered a materially adverse change in the terms or conditions of her employment.

*Johnson v. City of New York*, 326 F. Supp. 2d 364, 368 (E.D.N.Y. 2004) (citing *Georgy v. O'Neill*, No. 00–660, 2002 WL 449723, at *11 (E.D.N.Y. Mar. 22, 2002)).

As this Court has previously found that Plaintiff's Complaint contains facts sufficient to establish disability under the ADA, and that she suffered a materially adverse employment action, those elements, along with the first element of this claim,[5] shall not be addressed further here. As to the third element, a prima facie case of unequal terms and conditions of employer requires a showing that the employer treated similarly situated employees not in the protected group more favorably than the plaintiff. *See e.g. McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *O'Neill*,, 2002 WL 449723, at *11. "A discrimination plaintiff and other employees are similarly situated if they are employed in a position of comparable responsibilities and duties, and they have engaged in comparable conduct." *Partridge v. HIP*, No. 97–453, 2000 WL 827299, at *3, 2000 U.S. Dist. LEXIS 8714, at *7 (S.D.N.Y. June 26, 2000) (citing *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 97 (2d Cir.1994)).

Here, Plaintiff makes a general allegation that her employer "subjected [her] to invasive and excessive oversight, including frequent questioning about [her] schedule,

[5] An "employer" is defined by the ADA as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year ..." *See* 42 U.S.C. § 12111(5)(A). As Plaintiff alleges Food Bank for the Heartland employs 15-100 employees, for purposes of his initial review, this element is also deemed met.

broad email surveillance, forced and unnecessary meetings related to common data requests, and demands to document every request and output[,]" and that "[t]hese expectations were not applied to my peers." Filing No. 1 at 9. However, while it is not outside the scope of this Court's ability at this stage in the proceeding to presume that "peers" refers to other employees with similar responsibilities and duties, Plaintiff must amend her Complaint to include facts establishing that these employees with similar responsibilities and duties (but who were not disabled) were treated more favorably or otherwise received preferential treatment when engaging in conduct similar to Plaintiff's. *See* *Vanhorne v. N.Y.C. Transit Auth.*, 273 F.Supp.2d 209, 216 (E.D.N.Y.2003) ("To establish this [unequal terms and conditions] claim, plaintiff must show that there were other similarly situated employees, outside of the protected class, who engaged in conduct substantially similar to that of plaintiff but received preferential treatment."). While Plaintiff mentions other (anonymous) disabled individuals terminated their employment due to similar complaints, *see* Filing No. 1 at 10, Plaintiff fails to explain how her treatment was different from other non-disabled peers. *See, e.g.*, *Id.* (explaining that she was assigned a report at the last minute which was impossible to complete in the time given to set her up to fail but also because she was the only person with the skills and knowledge who could complete the report).

**4. Hostile work environment**

> To prevail on [an] ADA hostile work environment claim, [a plaintiff] must show that (1) "[she] is a member of the class of people protected by the statute;" (2) "[she] was subject to unwelcome harassment;" (3) "the harassment resulted from [her] membership in the protected class;" and (4) "the harassment was severe enough to affect the terms, conditions, or privileges of [her] employment." *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003)). We assess whether harassment affects a term,

> condition, or privilege of employment based on "the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [the employee's] job performance." *Id.* at 779 (quoting *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010)).

*Schmit v. Trimac Transportation, Inc.*, 172 F.4th 612, 619–20 (8th Cir. 2026).

Plaintiff alleges that she was subjected to "aggression, gaslighting, micromanagement, performative support, and public undermining" by her supervisor Caleb Miller which "created a climate of fear and instability that escalated further after my disclosures." Filing No. 1 at 9. However, rude or unpleasant conduct are insufficient to affect the terms and conditions of employment. *Moses v. Dassault Falcon Jet-Wilmington Corp*, 894 F.3d 911, 922-23 (8th Cir. 2018) (internal quotations, alterations, and citations omitted). A plaintiff instead must show that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment. *Id.* at 923 (internal quotations and citations omitted). Therefore, Plaintiff must amend her Complaint to allege sufficient facts to show the harassment she experienced, including the severity and the frequency of the conduct at issue, constitutes harassment under the ADA in order to proceed.

**B. FMLA**

Plaintiff also brings suit under the FMLA, however, she does not state what type of claim she raises. *See* Filing No. 1 at 3. As pleaded, any FMLA claim Plaintiff intends to bring cannot proceed without amendment.

The FMLA entitles an employee to twelve weeks of leave from work during any twelve-month period and two subsections of the statute establish prohibited acts. *See* 29 U.S.C. 2615(a)(1) (rendering it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA); 29

U.S.C. § 2615(a)(2) (making it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA). It follows that a claim under the FMLA occurs "when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012). The Eighth Circuit has described three types of claims arising under the FLMA potentially applicable here: (1) a failure to authorize FMLA leave; (2) a retaliation claim (an adverse act done in retaliation for an employee taking FMLA leave); and (3) a "discrimination" claim, which requires an employee to establish that after they exercised their FMLA right their employer discriminated against them "in the terms and conditions of employment." *Id.* (internal references omitted).

Here, if anything, it would appear Plaintiff intended to raise a discrimination claim as she does not allege her FMLA leave was not authorized or that adverse actions were taken *because* she took FMLA leave. However, because Plaintiff does not connect her taking FLMA leave as the basis for the difficulties she experienced at her workplace and subsequent termination, but instead seems to argue that she took FMLA leave *because* her employer failed to accommodate her disabilities, she must amend her Complaint to express what type of claim she intends to raise under the FMLA and plead the appropriate facts in support.

IT IS THEREFORE ORDERED:

1. Plaintiff is sua sponte granted leave to amend her Complaint. Plaintiff must file an amended complaint no later than **September 4, 2026**. Once an amended complaint is filed the Court will review Plaintiff's amended complaint to determine whether

summary dismissal is appropriate under 28 U.S.C. § 1915(e)(2). Any amended complaint filed by Plaintiff will supersede, rather than supplement, the Complaint.

2. Failure to file an amended complaint by the deadline set forth in this order shall result in the dismissal of Plaintiff's case without further notice.

3. Should Plaintiff require additional time to comply with this Memorandum and Order she must move for an extension, in writing, prior to the expiration of the deadline for compliance.

4. The Clerk's Office is directed to set a pro se case management deadline in this case using the following text: **September 4, 2026**: check for amended complaint.

Dated this 7th day of August, 2026.

BY THE COURT:

Joseph F. Bataillon
Senior United States District Court